# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### CASE NO. 18-23659-CIV-COOKE/GOODMAN

THE GABLES CONDOMINIUM AND
CLUB ASSOCIATION, INC.,

     Plaintiff,

v.

EMPIRE INDEMNITY INSURANCE COMPANY,

     Defendant.

_____/

## ORDER ON PLAINTIFF'S WORK PRODUCT ASSERTION

This lawsuit concerns a $43.6 million claim filed by a condominium association (The Gables Condominium and Club Association, Inc.) against its property insurer (Empire Indemnity Insurance Company) for damages allegedly sustained to two 18-story residential towers during Hurricane Irma, which made landfall in South Florida on September 10, 2017. The discovery dispute at issue here arises from a subpoena *duces tecum* that Empire sought to serve on DSS Condo, LLC, a non-party consulting company that provides construction management services to condominiums and that Gables's attorney retained. DSS prepared the damages estimate and hurricane damages inspection report. Gables served an objection to the proposed subpoena, the Undersigned held a hearing, and the parties submitted post-hearing memoranda. [ECF

Nos. 32, 33].

The fundamental issue underlying the dispute generated dramatically different positions by the parties on when Gables's work product immunity began. More specifically, the issue is when did Gables reasonably and objectively anticipate litigation? Gables says that it anticipated litigation from the **very day the storm hit**, September 10, 2017, because it became immediately clear that the loss would be substantial. But Empire contends that Gables's work product immunity did not start until July 16, 2018, the day Gables filed its lawsuit in state circuit court.

In addition to the possibility that one of these two dates is the launching point for the work product doctrine here, there are also myriad other possibilities, such as the day Gables hired counsel (November 3, 2017); the day Gables's general manager advised Empire that the association had retained a public adjuster (November 10, 2017); the day Empire issued its reservation of rights letter (November 15, 2017); the day Gables says that Empire provided a valuation for the repair estimate that fell below the deductible (February 2, 2018); the day Empire provided a status report advising that its investigation was ongoing (February 15, 2018); the day Gables first provided Empire with a damages estimate (May 21, 2018); the day Empire asked for additional information (June 8, 2018); the day an attorney for a Gables-oriented property appraiser accused Empire of delaying and refused to provide any of the requested information (June 13, 2018); the day Empire agreed to narrow its request for documents and

information (August 6, 2018); the day Gables submitted its Sworn Statement in Proof of

Loss (August 6, 2018); the day Gables served Empire with a summons and a copy of the

lawsuit (August 9, 2018); or the date Empire responded to the Proof of Loss (August 13,

2018).

The date on which Gables's work product protection began is important, of

course. If it started after May 21, 2018, then Empire would be entitled to the materials

that DSS created in connection with its May 21, 2018 Hurricane Damage Inspection

Report and estimate.

Gables has the burden of proving its work product claim. But it did not provide

any affidavits or declarations, did not submit any materials (subject to a work product

theory) under seal for the Undersigned's *in camera* review, and did not file or submit

under seal other documents (such as e-mails) to corroborate its theory that it anticipated

litigation on September 10, 2017. Instead, it relied on unverified rhetoric in its

memorandum.

Framed by the reality that Gables did not meet its burden to establish the

creation of a work product immunity on the early date it urges, the Undersigned has

reviewed the exhibits (mostly submitted by Empire, as Gables submitted only one

exhibit: Empire's November 15, 2017 reservation of rights letter) and concludes that

Gables's work product protection began on **June 13, 2018**. Therefore, Empire may serve

the *duces tecum* subpoena on DSS, which may not hold back documents before June 13,

2018 on a work product theory.

## I.    Factual Background

Gables seeks insurance proceeds under a commercial property insurance policy that Empire issued to Gables for the May 31, 2017 to May 31, 2018 policy period. The policy covers the condominium development referred to as The Gables Condominium and Club, which includes two 18-story residential towers in Coral Gables, Florida.

The insurance claim relates to alleged damage to the property caused by Hurricane Irma on September 10, 2017. Empire first received notice of the insurance claim on October 2, 2017. Between October 3, 2017 and October 24, 2017, Empire tried multiple times (by telephone, e-mail, and letters) to contact Gables to discuss the claim. Empire was directed to Gables's general manager, who responded for the first time on November 10, 2017.

He informed Empire that Gables had already retained a public adjuster. Empire responded with a November 15, 2017 reservation of rights letter. By then, however, no information about the specific claimed damage to the property had been provided to Empire.

Empire highlights in its memorandum that Gables had already retained counsel in connection with its claim before it had submitted any information to Empire about the claimed damages. Specifically, Gables hired counsel on November 3, 2017. And before any information about the claim had been submitted to Empire, Gables's counsel

had, in turn, retained a public adjuster, Daniel Odess of GlobalPro Recovery, Inc.

For its part, Empire retained a construction consulting and engineering firm, Madsen, Kneppers & Associates, Inc. ("MKA"), to assist in investigating the claim.

Between December 2017 and February 2018, MKA representatives visited the property several times as part of Empire's investigation. The first of these visits occurred on December 18, 2017. All these inspections were conducted before Gables sent any estimate to Empire identifying the building elements that it contends Hurricane Irma had damaged.

After February 2018, months passed without Gables submitting specific information regarding the scope of its claim.

Empire continued to apprise Gables of the status of its investigation. In a February 15, 2018 letter to Odess, Empire advised that Gables's claim remained open, Empire's investigation was on-going, and that no coverage determination had been made on Gables's claim.

On May 21, 2018, Gables provided Empire with a damage estimate containing specific information about the extent of Gables' claim. Gables's estimate totaled $43,629,666. DSS prepared Gables's estimate. Along with the estimate, Odess also provided Empire with DSS's Hurricane Damage Inspection Report, dated May 21, 2018, upon which the Gables's estimate is based.

Following Gables's submission of the estimate and DSS's supporting materials,

Empire sought further information from Gables about the grounds for its $43+ million claim. Empire wrote a letter to Odess, dated June 8, 2018, requesting various categories of information. But in a June 13, 2018 letter from counsel for Gables's public adjuster, Gables refused to provide the requested information and documentation.

In that June 13, 2018 letter, counsel said that nothing in the policy requires her or Gables to provide Empire with "the superfluous information you have requested" and argued that Empire's request is "clearly a delay tactic." [ECF No. 18-6, p. 2]. Moreover, the letter also claimed that Empire's request violated a Florida statute that was put "in place in order to prevent undue delays and not put an unnecessary burden upon the [i]nsured." *Id.*

Empire responded to the June 13, 2018 letter with an August 6, 2018 letter. Empire agreed, among other things, to narrow the scope of its requests to move the claim investigation forward. Empire also agreed to visit the offices of either Gables or its representative to review the records maintained there.

Gables did not provide the information or documentation that Empire requested.

Meanwhile, on July 16, 2018, Gables had filed this action against Empire in Florida State Circuit Court. But before Empire was served with the summons and complaint, Gables submitted a Sworn Statement in Proof of Loss (dated August 3, 3018) to Empire on August 6, 2018.

In support of the Proof of Loss, Gables resubmitted its May 21, 2018 damages

estimate and DSS's Hurricane Damage Inspection Report.

Three days after Gables submitted its Proof of Loss, on August 9, 2018, it served Empire with the summons and complaint. Empire had not yet responded to the Proof of Loss. Empire responded to the Proof of Loss in an August 13, 2018 letter, in which it stated that it was neither accepting nor rejecting the Proof of Loss.

Empire removed this case to this Court on September 7, 2018.

## II.    The Parties' Contentions

### A.    *Gables's Position*

Gables argues that "[b]eginning at the time Plaintiff submitted its claim to Defendant, the Parties had an antagonistic relationship, and Plaintiff, seeking to protect its interest in litigation that was likely to ensue, determined that hiring litigation counsel was necessary." [ECF No. 32, pp. 1–2]. Although Gables said it retained counsel on November 3, 2017, it has not identified any "antagonism" between the parties that occurred before then.

Gables further contends that it "immediately anticipated litigation" as of the day Hurricane Irma hit because the property "suffered catastrophic damage" and the amount Empire would need to pay out to cover the losses "would be substantial." [ECF No. 32, p. 5].

Gables also argues that its counsel retained DSS "as a consultant to help gather information and compile materials in preparation for **trial**." [ECF No. 32, p. 7 (emphasis

7

added)]. But that contention is inconsistent with Gables's decision to hand over to Empire the DSS-prepared damage estimate and Hurricane Damage Inspection Report on May 21, 2018, approximately two months before it filed its lawsuit.

Gables also proposes several fallback positions. To begin, Gables argues that the day it hired counsel (i.e., November 3, 2017) should be used as the day it anticipated litigation.

Alternatively, Gables argues that Empire's November 15, 2017 reservation of rights letter "crystalized" the conclusion "that, in order for Plaintiff to recover amounts owed under the Policy, litigation was almost certain." [ECF No. 32. p. 8]. Therefore, it argues that the Undersigned should use November 15, 2017 as the date when it anticipated litigation (assuming the Undersigned does not use the September 10, 2017 or November 3, 2017 dates).

Finally, as its last fallback position, Gables argues that February 2, 2018 is the date to use because, on that day, Empire provided its valuation, which was below the deductible. Therefore, given this below-the-deductible initial estimate, Gables argues that "it can be said, without question, that the parties were not going to resolve any disputes without litigation, thus deeming Plaintiff's anticipation of litigation objectively reasonable." [ECF No. 32, pp. 8–9]. Gables did not submit the February 2, 2018 letter or e-mail (assuming such written communication -- as opposed to an oral statement -- even exists), though, and neither did Empire.

### B.   *Empire's Position*

Empire contends that "anticipation of litigation" in the insurance context typically begins after the claim is denied. [ECF No. 33, p. 8]. Because Empire did not deny the claim here before Gables filed the lawsuit, it says that the lawsuit filing date of July 16, 2018 controls. But the authority upon which Empire relies arose in cases analyzing when a carrier anticipates litigation, not when an *insured* (like Gables) anticipates litigation.

Empire also argues that documents created by DSS in connection with Gables's submission of its insurance claim were drafted in the ordinary course of business, not because of the prospect of litigation. It says that DSS created the May 21, 2018 damages estimate and Hurricane Damage Inspection Report "for the specific purpose of being presented to Empire as the scope of Gables'[s] claim." [ECF No. 33, p. 9].

Concerning Gables's retention of counsel in November 2017, Empire argues that Gables had the right to hire counsel (and a public adjuster) but cannot "use this as a means of shielding all subsequent materials created by DSS Condo as work product[.]" [ECF No. 33, p. 10].

Similar to Gables, Empire has a fallback, alternative position, as well. Specifically, Empire argues, in the alternative, that June 13, 2018 should be used as the date when Gables reasonably anticipated litigation. That is the day when Gables's public adjuster's counsel sent a letter refusing to provide the additional information requested by Empire

(and accusing Empire of delay and a violation of a Florida statute).

## III. Applicable Legal Standards and Analysis

"The attorney work-product privilege traces its roots to the recognition by the Supreme Court, in *Hickman v. Taylor*, 329 U.S. 495, 510-11, 67 S.Ct. 385, 393, 91 L.Ed. 451 (1947), that 'it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel.'" *Cox v. Admn'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1421 (11th Cir. 1994), *opinion modified on reh'g on other grounds*, 30 F.3d 1347 (11th Cir. 1994); *see also United Kingdom v. United States*, 238 F.3d 1312, 1321 (11th Cir. 2001) ("The work-product doctrine reflects the strong 'public policy underlying the orderly prosecution and defense of claims.'"). That public policy has been codified and is now governed by the principles set forth in Federal Rule of Civil Procedure 26(b)(3)(A), which reads in pertinent part:

> *Documents and Tangible Things.* Ordinarily, a party may not discover documents and tangible things that are prepared **in anticipation of litigation or for trial** by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent).[1]

Fed. R. Civ. P. 26(b)(3)(A) (emphasis added).

Before determining whether the Undersigned should sustain Gables's work product objection to the subpoena that Empire served on DSS, the Undersigned will first outline the relevant legal principles underlying the work product doctrine.

---

[1] The rule also provides for exceptions, but neither party has addressed any of those here.

First, federal law governs work product assertions, regardless of whether they arise in diversity actions or federal question jurisdiction lawsuits. *See, e.g., Milinazzo v. State Farm Ins. Co.*, 247 F.R.D. 691, 699–700 (S.D. Fla. 2007); *see also Frontier Ref., Inc. v. Gorman–Rupp Co.*, 136 F.3d 695, 702 n.10 (10th Cir. 1998) (stating that, "[u]nlike the attorney client privilege, the work product privilege is governed, even in diversity cases, by a uniform federal standard embodied in Fed. R. Civ. Pr. 26(b)(3)"); *Bradt v. Smith*, 634 F.2d 796, 799 (5th Cir. 1981) (holding that work product immunity "is embodied, as a federal right, in the Federal Rules of Civil Procedure.").

Second, "district courts are entitled to **broad discretion** in managing pretrial discovery matters." *Perez v. Miami–Dade Cty.*, 297 F.3d 1255, 1263 (11th Cir. 2002) (emphasis added). This discretion extends to rulings concerning the applicability of the work-product doctrine. *Republic of Ecuador v. Hinchee*, 741 F.3d 1185, 1188 (11th Cir. 2013).

Third, the party claiming work product immunity always has the burden to establish the claimed protection. *Hinchee*, 741 F.3d 1185 at 189; *Milinazzo*, 247 F.R.D. at 698.

Fourth, a party must anticipate litigation **at the time the documents were created** for the protection to apply. *Milinazzo*, 247 F.R.D. at 698.

Fifth, the Court must determine when the document was created and why it was created. *Id.* In fact, "in determining whether a document was made in anticipation of

litigation, the **primary focus** is the reason or purpose for creating the document." *Place St. Michel, Inc. v. Travelers Prop. Cas. Co. of Am.*, No. 06-21817-CIV, 2007 WL 1059561, at *2 (S.D. Fla. Apr. 4, 2007) (emphasis added) (quoting *Guidry v. Jen Marine LLC*, No. Civ. A 03-0018, 2003 WL 22038377, at *2 (E.D. La. Aug. 22, 2003)).

Sixth, applying a work product objection in the context of producing insurance claim files in a direct breach of contract action is somewhat "complex" because "it is in the ordinary course of business for an insurance company to investigate a claim with an eye toward litigation." *Milinazzo*, 247 F.R.D. at 701. Recognizing this practical reality, many courts, including several in the Southern District of Florida, establish a rebuttable presumption that documents or things prepared before an insurer's final decision on a claim are not work product, but that documents and things produced *after* a claim's denial are work product. *See id.; see also Royal Bahamian Ass'n, Inc. v. QBE Ins. Corp.*, 268 F.R.D. 695, 698 (S.D. Fla. 2010); *1550 Brickell Assocs. v. Q.B.E. Ins. Co.*, 253 F.R.D. 697, 698 (S.D. Fla. 2008); *accord Harper v. Auto-Owners Ins. Co.*, 138 F.R.D. 655, 662 (S.D. Ind. 1991).

A party involved in a dispute with an insurance carrier may rebut the presumption that documents prepared before the carrier's final decision are not work product "by specific evidentiary proof of objective facts." *Milinazzo*, 247 F.R.D. at 701; *see also Sun Capital Partners, Inc. v. Twin City Fire Ins. Co.*, No. 12-81397-CIV, 2015 WL 1860826, at *4 (S.D. Fla. Apr. 22, 2015); *Essex Builders Grp., Inc. v. Amerisure Ins. Co.*, No.

6:04-CV-1838-ORL-22, 2006 WL 1733857, at *2 (M.D. Fla. June 20, 2006).

In determining whether the presumption has been rebutted, the Court may consider the length of time between the alleged date of anticipated litigation and the date suit was actually filed, whether the parties were working towards a resolution, and whether there was a clear intention to sue made by one of the parties. *Sun Capital Partners*, 2015 WL 1860826, at *4.

But some courts have clarified and limited this rebuttable presumption about work product in the insurance context and applied it only to an *insurer's* investigation of claims, as the rationale justifying the presumption is inapplicable to the *insured* (or its agents). *See Sun Capital Partners, Inc. v. Twin City Fire Ins. Co.*, No. 12-81397-CIV, 2015 WL 9257019, at *1 (S.D. Fla. Dec. 18, 2015) (explaining that the district judge held that the *Milinazzo* presumption "should only be applied to insurance companies and not to an insured").

The district court's opinion in *Sun Capital Partners* noted that the courts in this district that have adopted the rebuttable presumption have done so only when applying the work product doctrine to an insurer's investigation of claims. *Sun Capital Partners*, No. 12-81397 (S.D. Fla. August 11, 2015), ECF No. 208, p. 5. In addition, the district court (the Honorable Kenneth A. Marra) pointed out that those courts note that a "special analysis" is necessary because "insurance companies ordinarily investigate a claim in contemplation of litigation." *Id.* Judge Marra emphasized that "[u]nlike an

insurer, an insured does not have 'a duty in the ordinary course of business to investigate and evaluate [insurance] claims.'" *Id.* (quoting *Harper*, 138 F.R.D. at 663). As a result, Judge Marra concluded, applying the presumption to the insured was contrary to law. *Id.*

The Undersigned agrees with that analysis and concludes that the *Milinazzo* insurance context rebuttable presumption applies only to the insurer's files, rejects Empire's argument that the work product immunity for Gables did not start until the denial of the claim, and accepts Gables's view that an "ordinary" work product analysis applies to the DSS subpoena.

Seventh, the burden to demonstrate that a privilege applies is "not, of course, discharged by mere conclusory or *ipse dixit* assertions, for any such rule would foreclose meaningful inquiry into the existence of the relationship, and any spurious claims could never be exposed." *Bridgewater v. Carnival Corp.*, 286 F.R.D. 636, 639 (S.D. Fla. 2011) (internal citation omitted). In other words, "[t]he mere conclusory assertion that material sought is covered by . . . [the] work product privilege is not sufficient to render such material undiscoverable." *Place St. Michel*, 2007 WL 1059561, at *3 (citing *Ameritrust Co., N.A. v. White,* Civ. No. 1:90-CV-2691-JEC, 1993 WL 819124, at *3 (N.D. Ga. Oct. 20, 1993)).

Eighth, an improperly asserted claim of privilege is no claim of privilege at all. *Bridgewater*, 286 F.R.D. at 639.

Ninth, the party claiming a privilege must provide the Court with underlying facts demonstrating the existence of the privilege, which may be accomplished by affidavit. *Id.* In other words, "the onus is on the party claiming immunity to provide competent **evidence** that the materials in question were created in anticipation of litigation." *Place St. Michel*, 2007 WL 1059561, at *3 (emphasis added).

Tenth, the mere fact that the party seeking work product protection submits an affidavit (which was not done here) is not necessarily sufficient to sustain the work product assertion. *See, e.g., Fid. Nat'l Title Ins. Co. v. Wells Fargo Bank, N.A.*, No. 12-22437, 2013 WL 12138558, at *2 (S.D. Fla. July 19, 2013), *aff'd*, No. 1:12-CV-22437-UU, 2013 WL 12138559 (S.D. Fla. July 29, 2013) (noting that plaintiff submitted an affidavit but finding it "wholly conclusory and [with] few details to substantiate her claim that 'Notes' were created 'in anticipation of litigation'"); *see also Bridgewater*, 286 F.R.D. at 639 (explaining that "[u]nless the affidavit is precise to bring the document within the rule, the Court has no basis on which to weigh the applicability of the privilege at all"); *cf. Abby v. Paige*, No. 10-23589-CIV, 2011 WL 13223681, at *2 (S.D. Fla. Nov. 30, 2011) (explaining party "typically" meets burden by affidavit but cannot "discharge that burden with conclusory allegations" and noting that declaration was "minimally useful"; provided "mostly . . . conclusory assertions"; was "not enough to establish the privilege claimed"; and, "to the contrary, it raises more questions than it answers").

Finally, Gables argues that DSS is a "consultant" who counsel retained to "help

gather information and compile materials in preparation for trial." [ECF No. 32, p. 7]. It designates DSS as an expert who has "not yet [been] disclosed as a trial expert." [ECF No. 32, p. 8]. In other words, this part of Gables's argument necessarily relates to Rule 26(b)(4)(D), which states as follows:

> **(D)** *Expert Employed Only for Trial Preparation*. Ordinarily, a party may not, by interrogatories or deposition, discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or to prepare for trial and who is not expected to be called as a witness at trial. But a party may do so only:
>
> > **(i)** as provided in Rule 35(b); or
> >
> > **(ii)** on showing exceptional circumstances under which it is impracticable for the party to obtain facts or opinions on the same subject by other means.

Fed. R. Civ. P. 26(b)(4)(D)(i)–(ii).

This protection, however, is not absolute. Instead, as the Advisory Committee explains:

> It should be noted that the subdivision does not address itself to the expert whose information was not acquired in preparation for trial but rather because he was an actor or viewer with respect to transactions or occurrences that are part of the subject matter of the lawsuit. **Such an expert should be treated as an ordinary witness**.

Fed. R. Civ. P. 26 advisory committee's note to 1970 amendment (emphasis added).

In other words, "[i]t is possible for a witness to wear two hats: one as a specially employed expert in anticipation of litigation and one as an ordinary witness." *Essex Builders Grp., Inc. v. Amerisure Ins. Co.*, 235 F.R.D. 703, 705 (M.D. Fla. 2006) (denying

plaintiff's motion to quash subpoena served on expert and permitting expert's deposition to be taken about facts or opinions he held before being retained in connection with the litigation); *see Jones v. Celebration Cruise Operator, Inc.*, No. 11-61308-CIV, 2012 WL 1029469, at *3 (S.D. Fla. Mar. 26, 2012) (adopting two-hat approach); *see also U.S. ex rel. Civil Const. Techs., Inc. v. Hanover Ins. Co.*, No. 6:13-MC-42-ORL-18TBS, 2013 WL 1810817, at *3 (M.D. Fla. Apr. 29, 2013) (same).

When a witness wears two hats, he is considered an ordinary fact witness before litigation was reasonably anticipated. *See Bartram, LLC v. Landmark Am. Ins. Co.*, No. 110-CV-00028-SPM-GRJ, 2011 WL 284448, at *3 (N.D. Fla. Jan. 24, 2011) (discussing situations were non-testifying experts "also play a role in the underlying transaction(s) or event(s) that eventually lead to litigation before they are formally retained as a non-testifying witness to **aid a party in preparing for litigation**") (emphasis added); *see also Essex*, 235 F.R.D. at 704 (stating that expert whose information was not acquired in preparation for trial should be treated as an ordinary witness because he was an actor or viewer with respect to transactions or occurrences involved in the subject matter of the lawsuit). Under these circumstances, witnesses are entitled to work product protection for only the period after litigation was reasonably anticipated. *See Bartram*, 2011 WL 284448, at *3; *see also Jones*, 2012 WL 1029469, at *2.

Therefore, the Undersigned will view the objection to the DSS subpoena with the perspective that (1) DSS is an ordinary fact witness for purposes of the documents it

created for submission to Empire in connection with Gables's submission of its hurricane damage claim, and (2) work product protection begins when DSS was retained to help prepare for *litigation*.

At the risk of saying the obvious, any assessment of Gables's work product claim must begin with the critical observation about the absence of any actual evidence to support its primary or fallback positions. Its counsel may well be a highly reputable attorney and a skilled trial lawyer and oral advocate, but that alone does not convert rhetoric (in a memorandum or at a discovery hearing) into competent *evidence* upon which the Undersigned can rely. The mere assertion of argument -- e.g., "my client anticipated litigation from the very day the hurricane hit" -- is inadequate to meet the burden. *See, e.g., Bridgewater*, 286 F.R.D. at 638-39 (noting that federal courts have consistently recognized that the party invoking the immunity has the burden to establish "all of its essential elements" and emphasizing that "[a] failure of proof as to **any** element causes the claim of privilege to fail") (emphasis added).

So the Undersigned could summarily reject the work product claim based solely on the lack of evidence. Nevertheless, in an abundance of caution, the Undersigned will discuss Gables's different theories. That discussion will, when proper, necessarily mention the lack of evidence on a certain point.

Gables's first argument is that it anticipated litigation the day the hurricane hit because the damages were substantial. Under this theory, **every** insured would always

be entitled to work protection from the day of an incident -- whether it is a hurricane, a flood, a car collision, a collapsed bridge, or an exploding bottle or tornado -- generating substantial damages claims. Gables has not submitted any legal authority to support such a sweeping and dramatic rule.

Although Gables relied upon some authority to support its September 10, 2017 work product trigger date theory, those cases are distinguishable and are thus insufficient to persuade me to adopt the argument.

In *Office Depot, Inc. v. National Union Fire Insurance Company of Pittsburgh, PA.*, No. 09-80554-CIV, 2010 WL 11505167 (S.D. Fla. Aug. 17, 2010), the Court found that work product protection began on the date that the insured, Office Depot, submitted to its insurance carrier a "Notice of Circumstances." *Id.* at *8. That note advised about the likelihood of securities claims arising out of matters reported about two weeks earlier in an article suggesting that Office Depot had violated an SEC disclosure regulation. However, there are several distinguishing factors about the ruling.

First, Office Depot's work product assertion was supported by an affidavit from its chief litigation counsel. Second, there were many substantial facts showing a genuine, objective belief that litigation was possible. Third, by way of illustration, those facts generated a scenario dramatically different than the one here, involving only a perception that a claim would be substantial: (1) the company's general counsel had already initiated an internal investigation several days before the article (and more than

two weeks before the Notice was submitted to the carrier); (2) that same general counsel sent a litigation hold letter to senior officers, making express reference to anticipated litigation with the SEC one week before the article was published; (3) a more-robust document hold was issued a week and a half before the Notice was submitted to the carrier; (4) the Board sent indemnification letters to several senior corporate officers, recommending retention of separate legal counsel, before the Notice was sent to the carrier; and (5) the attorney explained that his anticipation of coverage litigation was based on, in part, his experience with carrier disputes "with National Union in particular." *Id.*

So the facts in *Office Depot* are nothing like the facts here, and, in any event, were corroborated by testimony, as opposed to only attorney argument. Unlike the work product presentation made by affidavit in *Office Depot,* Gables did not contend that it, its counsel, or its expert had negative experience before on coverage issues with Empire. Apparently, its theory must be that coverage disputes are expected with **every** insurance carrier and that litigation should be anticipated with **all** carriers. The Undersigned cannot say with certainty whether this is Gables's position because it never expressly advanced that theory and because it never submitted any evidence on that point (or any other point, for that matter).

In *Lagace v. New England Central Railroad,* No. 3:06CV1317RNC, 2007 WL 2889465 (D. Conn. Sept. 28, 2007), another case relied upon by Gables, the defendant there

submitted an affidavit from its in-house counsel, establishing the elements of the work product assertion. Again, Gables submitted no affidavits here.

*Rigdon v. Flowserve Corporation*, No. 16-CV-304 GKF-FHM, 2017 WL 7038424 (N.D. Okla. May 17, 2017), is a perfunctory, two-page opinion that cites no case law and contains little to no analysis. But the party seeking work product protection there submitted an affidavit, and both general counsel and outside counsel were contacted immediately after a serious, non-routine fire. In this case, of course, there is no affidavit, and although the hurricane was on September 10, 2017, Gables retained counsel on November 3, 2017. So that chronology does not support an anticipation of litigation on September 10, 2017, the very day the hurricane came ashore.

Finally, in *State National Insurance Company v. Anzhela Explorer LLC*, No. 07-61162-CIV, 2008 WL 11333247 (S.D. Fla. Sept. 26, 2008), a case involving an insurer's attempt to rebut the *Milinazzo* presumption, the magistrate judge reviewed *in camera* "an extensive volume of privileged documents" because of the "unique nature" of the case. *Id.* at *1–2. Based on the *in camera* review (a procedure Gables never suggested here), the magistrate judge concluded that "[t]he documents evidence a clear anticipation of possible litigation at a very early stage of the insurer's investigation." *Id.* at *2. Specifically, the carrier retained outside counsel to conduct and oversee its response to the claim -- a development which is "certainly not the norm in most insurance cases." *Id.*

Perhaps most importantly, the circumstances "immediately raised suspicions of possible fraud or sabotage." *Id.* For example, the policy at issue for the insured vessel was purchased very shortly before the alleged loss occurred, a scenario the Court explained as "rais[ing] suspicions on an insurer's part." *Id.* at *4. Likewise, the Court noted that the circumstances involved in the vessel's sinking caused "this insurer's 'eyebrows' [to be] immediately raised." *Id.*

Thus, the *Anzhela Explorer* Court relied on **specific** facts that justified the work product theory. This is in stark contrast to the steps taken by Gables, which seems to rely on a generic, vague, and implicit notion that all insureds anticipate litigation whenever a claim is substantial. Other than a feeling that the claim would be substantial, Gables offers no other facts (verified or otherwise) to support its September 10, 2017 work product date hypothesis.

Gables's next argument is that its work product immunity began on November 3, 2017, when it retained counsel. To be sure, it does cite cases which hold that the involvement of counsel is a factor to be considered. But those cases do not sway me to accept the argument.

First, the Undersigned does not find convincing the evidence-free statement that, on November 3, 2017, "[d]ue to the catastrophic loss suffered to its Property, Plaintiff hired the undersigned to help gather materials and **facilitate its litigation position**." [ECF No. 32, p. 7 (emphasis added)]. It is equally possible that Gables hired counsel to

help evaluate the facts and aid in the submission of the claim itself. There is no evidence in the record to corroborate the argument that counsel was retained in early November for *litigation* purposes, as opposed to being hired to shepherd Gables through the process of submitting a major insurance claim, following it up with the required sworn proof of loss, and responding to requests for documents and information.

Second, other aspects of Gables's memorandum suggest that counsel's initial role was not litigation-oriented. For example, Gables says that counsel retained DSS, but that company prepared a damage estimate and comprehensive report that were then submitted to Empire to document and corroborate the alleged loss. Therefore, it seems as though Gables, its counsel, and DSS all worked together to prepare the materials that were submitted to Empire on May 21, 2018. This is part of the standard process for claims submission, required by the policy, and does not necessarily evidence an anticipation of litigation.

Gables's next theory is that Empire's November 15, 2017 reservation of rights letter [ECF No. 33-4] caused it to anticipate litigation. But there is nothing in that letter that would cause a reasonable and objective view that litigation was possible. At bottom, that letter confirms the receipt of the claim, acknowledges the insured's retention of a public adjuster, and explains that it has not received any information about or from the public adjuster.

The letter is basically a standard reservation of rights letter, issued before Empire

received any specific information about the claim. It also noted that Empire was "continuing [its] investigation of [Gables's] claim" and further pointed out that Empire would "provide [Gables] with [its] conclusion as quickly as possible." [ECF No. 34, p. 3]. After parroting the standard reservation of rights language, the letter also noted that Empire "is willing to review and consider any additional documentation and/or information [Gables] may wish to provide that [it] believe[s] might have a bearing on coverage for this claim." *Id.*

Although Gables cited a case to support its theory that a reservation of rights letter somehow causes an insured to anticipate litigation, the Undersigned does not find the case persuasive. Specifically, in *Mt. Hawley Insurance Company v. Pallet Consultants Corporation*, No. 06-61763-CIV, 2008 WL 11333811 (S.D. Fla. Feb. 28, 2008), the magistrate judge used the reservation of rights letter as the line of demarcation for the work product immunity: documents created before the letter were not entitled to protection, while those created after the letter were worthy of protection. But the judge cited no authority for that approach, and her ruling did not discuss any analysis. It simply announced, in one sentence, the ruling. The Undersigned will not rely on *Mt. Hawley* for a so-called theory that all documents created before a reservation of rights letter are not work product material but all created after the letter deserve the work product immunity.

Gables's next theory is that February 2, 2018 is the date to use for the start of its

work product immunity because that is "when Defendant provided its valuation of the cost of repairing Plaintiff's property damage." [ECF No. 32, p. 8]. But Gables did not submit a letter, an e-mail, or memorandum to pinpoint how Empire made its valuation position known. Indeed, it is entirely possible that Gables is referring to an *oral* communication. The Undersigned cannot find that work product protection began on a certain day under conditions as vague as these. Words matter. Without knowing exactly what Empire communicated when it supposedly gave its below-the-deductible valuation, the Undersigned cannot reach any meaningful conclusions.

What if the hypothetical e-mail said, "Our initial, preliminary view is that there is 'X' dollars in damages, but this is only a very early assessment, and please rest assured that the claim remains open and that we are committed to evaluating additional information, including (and especially) the damages report you advised us would be forthcoming from your expert?" That language would likely cause a much-different reaction than a formal letter which said, in a terse, one-sentence assertion: "Coverage is highly unlikely because the damages do not exceed the deductible." The second hypothetical might cause Gables to anticipate litigation, while the first might not lead to that result. Because no further detail was provided, the Undersigned concludes that Gables did not meet its burden of establishing an anticipation of litigation as of February 2, 2018.

Gables did not provide any other alternative work product initiation dates, so the

Undersigned will evaluate other dates proffered by Empire.

As outlined above, the Undersigned rejects Empire's *Milinazzo* theory (because we are not considering documents in an *insurer's* file). The Undersigned, therefore, does not accept the lawsuit-filing date of July 16, 2018 as the starting point for Gables's work product protection.

Instead, the Undersigned deems as particularly significant, at least based on this limited evidentiary record, the June 13, 2018 letter from counsel for the public adjuster. The language in that letter certainly demonstrated what Gables deems to be "an antagonistic relationship." Given that Empire was being accused of intentionally stalling the claim processing and of violating state insurance law, this is certainly a date when both parties anticipated litigation.

It may well be that other, earlier communications might establish an antagonistic relationship by an earlier date. But Gables has not submitted any document to evidence that, and the Undersigned can rely only on the materials presented.

## IV.    Conclusion

Based on this record, the Undersigned concludes that Gables has not met its burden of demonstrating an anticipation of litigation by September 10, 2017; November 3, 2017; or February 2, 2018. For the reasons outlined above, the Undersigned finds that Gables's work product protection began on June 13, 2018.

Although this ruling is in an order, the parties may, of course, pursue objections.

Under Rule 72(a), a party may object to a magistrate judge's decision of a nondispositive matter. Fed. R. Civ. P. 72(a). "The district judge in the case must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law." *Id.; see also* 28 U.S.C. § 636(b)(1)(A). This standard of review is "extremely deferential." *Sun Capital Partners*, 2015 WL 11921411, at *1. "A finding is clearly erroneous only if 'the reviewing court, after assessing the evidence in its entirety, is left with a definite and firm conviction that a mistake has been committed.'" *Id.* (quoting *Krys v. Lufthansa German Airlines*, 119 F.3d 1515, 1523 (11th Cir. 1997)).

Or, as the Seventh Circuit has put it: "[t]o be clearly erroneous, a decision must strike us as more than just maybe or probably wrong; it must . . . strike us as wrong with the force of a five-week-old, unrefrigerated dead fish." *Parts & Elec. Motors v. Sterling Elec., Inc.*, 866 F.2d 228, 233 (7th Cir. 1988). "The mere fact that a reviewing Court might have decided the issue differently is not sufficient to overturn a decision when there are two permissible views of the issue." *Sun Capital Partners*, 2015 WL 11921411, at *1 (internal quotation omitted). "[T]he 'clear error' exception must be rarely invoked." *Cox Enters., Inc. v. News-Journal Corp.*, 794 F.3d 1259, 1272 (11th Cir. 2015).

Given the upcoming trial schedule and discovery cutoff deadlines, the parties and DSS are urged to move forward quickly on completing the discovery arising from the subpoena served on DSS.

**DONE AND ORDERED** in Chambers, in Miami, Florida, on March 22, 2019.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

<u>**Copies furnished to**</u>:
The Honorable Marcia G. Cooke
All counsel of record